IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - §
KEYSTONE AUTONICS, INC.,                                         §
                                                                 §
        Plaintiff                                       §     Civil Action No. 2:07-CV-61 (TJW)
        Counterclaim Defendant,                          §
                                                                 §     Judge Ward
    v.                                                   §
                                                                 §
SIRIUS SATELLITE RADIO INC.,                                     §     Jury Requested
XM SATELLITE RADIO HOLDINGS, INC.                                §
and XM SATELLITE RADIO, INC.,                                    §
                                                                 §
                                                                 §
        Defendants and                                   §
        Counterclaim Plaintiffs.                         §
                                                                 §
                                                                 §
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - §

**DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION ...................................................................................................... 1

LEGAL STANDARD ................................................................................................ 1

ARGUMENT ............................................................................................................. 2

I. "Computer System"
(ʻ123 Disputed Terms 1 & 2; ʻ592 Disputed Terms 1, 2 & 3) ............................... 2

  A. Mr. Hindman Defined "Computer System"
  as Flexible and General Purpose ...................................................... 3

  B. Mr. Hindman Distinguished His Invention Over
  the Prior Art as a Flexible,
  General Purpose "Computer System" ............................................... 5

  C. Keystone Cannot Explain Away the
  Overwhelming Intrinsic Record ..................................................... 10

II. "Persistent Unique Hardware Identification Used to Restrict Access to Data
Received at the Unit Via the Wireless Signal" (ʻ123 Disputed Term 5) ............. 12

  A. The Computer System Verifies the
  Persistent Unique Hardware Identification ..................................... 13

  B. Persistent Means Non-Volatile, Not Permanent ........................... 15

  C. The Restricted Data is Not Limited
  to "User Requested Data" ............................................................... 16

  D. A Unique Hardware Identification Need
  Not be Unique to the World ............................................................ 16

  E. Related Terms: ................................................................................ 17

    (1) "Restrict Unit Functions to Authorized Users"
    (ʻ123 Disputed Term 8) ................................................. 17

    (2) "Recognize a Unique Address in Order to
    Communicate With the One or More
    Line Replacement Units" (ʻ592 Disputed Term 8) ...... 18

III.    "Unit" ('123 Disputed Term 3)...............................................................19

    A.    The Specification Teaches That a "Unit"
           is Modular and Easily Replaceable .....................................20

    B.    The File History Confirms That a "Unit"
           is Modular and Field-Replaceable.........................................21

    C.    Related Term:........................................................................23

          (1)    "Line Replacement Unit" ('592 Disputed Term 4) .....................23

IV.    The Claims Expressly Recite That the "Discrete Line Means"
        Provides Addressing Information ('592 Disputed Term 9)..................................24

V.    Other Disputed Claim Terms........................................................26

    A.    Keystone's Constructions For "Perform a Function" Are
           Confusing and Unnecessary....................................................26

          (1)    "Perform a Function in the Mobile Environment
                in Cooperation With the Computer System"
                ('123 Disputed Term 4)................................................26

          (2)    "Wherein Each of the Line Replacement Units
                Performs a Dedicated Function in the Mobile
                Environment in Cooperation With the Processing Means
                of the Computer System" ('592 Disputed Term 5)......................26

    B.    The Intrinsic Record Contradicts
           Keystone's Constructions For Data Bus...................................27

          (1)    "Data Bus Means  . . . For Transferring a Combination
                of Address, Control, and Data Information"
                ('592 Disputed Term 6)................................................28

          (2)    "A Data Bus Coupled to the Computer System and
                the Unit For Transferring Unit Data Information"
                ('123 Disputed Term 6)................................................27

    C.    "Means For User Applications" is Indefinite
           ('592 Disputed Term 10) .......................................................29

CONCLUSION.....................................................................................29

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE**

*800 Adept, Inc. v. Murex Secs., Ltd.*,
   539 F.3d 1354 (Fed. Cir. 2008) ...........................................................................8

*Andersen Corp. v. Fiber Composites, LLC*,
   474 F.3d 1361 (Fed. Cir. 2007) .........................................................................23

*Applied Med. Resources Corp. v. U.S. Surgical Corp.*,
   448 F.3d 1324 (Fed. Cir. 2006) .........................................................................25

*Computer Docking Station Corp. v. Dell, Inc.*,
   519 F.3d 1366 (Fed. Cir. 2008) ...........................................................................9

*Flex-Rest. LLC v. Steelcase, Inc.*,
   455 F.3d 1351 (Fed. Cir. 2006) .........................................................................22

*Geneva Pharms., Inc. v. GlaxoSmithKline PLC*,
   349 F.3d 1373 (Fed. Cir. 2003) .........................................................................29

*Helmsderfer v. Bobrick Washroom Equip., Inc.*,
   527 F.3d 1379 (Fed. Cir. 2008) .........................................................................25

*Honeywell Int'l, Inc. v. ITT Indus., Inc.*,
   452 F.3d 1312 (Fed. Cir. 2006) ...........................................................................4

*Hutchins v. Zoll Med. Corp.*,
   492 F.3d 1377 (Fed. Cir. 2007) .....................................................................9, 10

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ...........................................................................2

*Praxair, Inc. v. ATMI, Inc.*,
   __ F.3d __, Nos. 2007-1483, 2007-1509,
   2008 WL 4378391 (Fed. Cir. Sept. 29, 2008).................................................22

*Rheox, Inc. v. Entact, Inc.*,
   276 F.3d 1319 (Fed. Cir. 2002) ...........................................................................8

*SciMed Life System, Inc. v. Adv. Cardiovascular Sys., Inc.*,
   242 F.3d 1337 (Fed. Cir. 2001) .........................................................................21

*Seachange Int'l, Inc. v. C-COR Inc.*,
   413 F.3d 1361 (Fed. Cir. 2005) .................................................................12

*Tandberg Data Corp. v. Hewlett-Packard Co.*,
   2008 U.S. Dist. LEXIS 8094 (D. Colo. Jan. 22, 2008) ..............................17

*Tandon Corp. v. U.S. Int'l Trade Comm'n*,
   831 F.2d 1017 (Fed. Cir. 1987 ) ...................................................................8

*Uniloc USA, Inc. v. Microsoft Corp.*,
   447 F. Supp. 2d 177 (D.R.I. 2006) ............................................................17

*Wenger Mfg.., Inc. v. Coating Mach. Sys., Inc.*,
   239 F.3d 1225 (Fed. Cir. 2001) .................................................................23

## DOCKETED CASES

*Versata Software, Inc. v. Sun Microsystems, Inc.*, Civil Action No. 2-06-CV-358,
   2008 WL 3914098 (E.D. Tex. Aug. 19, 2008)......................................9, 23

## STATUTES

35 U.S.C. § 112 ...........................................................................................15

## INTRODUCTION

Defendants respectfully submit this brief in support of their construction of the disputed terms in response to Keystone's opening claim construction brief ("Keystone's Brief"). There are at least four critical aspects of the '123 patent and '592 patent (the "Hindman Patents") that guide the construction of the disputed terms:

- From the earliest articulation of the purported invention in a provisional application and throughout prosecution, named inventor George Hindman characterized his invention as requiring a flexible, general purpose computer, capable of running a variety of applications.

- The security feature of the purported invention relates to the interaction between two hardware components — the unit and the computer.  The computer receives a unit's persistent hardware identification or unique address and then determines whether to restrict access to data or to allow further communication.

- The invention's purportedly novel "architecture" is a computer connected to a variety of *modular* and *easily replaceable components* — referred to as "line replacement units" in the '592 patent and as "units" in the '123 patent.

- The purportedly novel I/O management and data bus "architecture" includes a data bus working in conjunction with a discrete line to "address" (and not merely "communicate with") its modular components.

Keystone's Brief ignores and misconstrues these central aspects of the claimed invention and largely consists of conclusory statements about what the invention could encompass.  In contrast, Defendants identify the portions of the intrinsic record where the inventor clearly and unambiguously defined his "invention."  Keystone cannot now alter the scope of the Hindman Patents to serve its purposes in this litigation.

## LEGAL STANDARD

Defendants generally agree with Keystone's recitation of the relevant jurisprudence concerning claim construction.  However, as shown below, Keystone has turned those principles on their head by ignoring the context of the claims and the pertinent teachings of

the specification and prosecution history.  Defendants' proposed constructions faithfully adhere

to the governing claim construction principles set forth in *Phillips v. AWH Corp.*, 415 F.3d 1303

(Fed. Cir. 2005) (*en banc*) and its progeny to reflect the true scope of the disputed claims.

## ARGUMENT

The parties identified eighteen terms that require construction.  As Keystone's

Brief demonstrates (through its various cross references), many of the terms warrant the same

construction or raise the same arguments to support the proposed construction.  As a result,

Defendants have grouped the discussion of related terms as follows: (1) "computer system"

(which is grouped with three related terms); (2) "persistent unique hardware identification"

(which is grouped with two related terms); (3) "I/O processing means uses the data bus means in

conjunction with the discrete line means to address"; (4) "unit" (which is grouped with the

related term "line replacement unit"); and (5) other terms that cannot be grouped.

## I.      "Computer System" ('123 Disputed Terms 1 & 2; '592 Disputed Terms 1, 2 & 3)

| Claim Term In Context | Defendants' Proposed Construction |
|---|---|
| A ***computer system*** comprising: a processor; an input device; an output display; | A flexible, general purpose personal computer capable of running a variety of operating systems and application programs. |

Defendants assert that the intrinsic record unambiguously describes the "computer

system" to mean a flexible, general purpose personal computer capable of running a variety of

operating systems and application programs.  It is not merely any computer as Keystone posits.

The specification affirmatively defines the "present invention" as a "new, ***flexible***

mobile computer architecture" and identifies the variety of applications it can operate.  During

prosecution, Mr. Hindman repeatedly and clearly distinguished dedicated and single purpose

computer systems found in the prior art from the computer of his "invention" that he described as

"general," "infinitely flexible," and capable of running "any number of different mobile

applications."  Indeed, Keystone makes this same distinction in describing the purported problem

solved by the Hindman Patents:

> Mr. Hindman surveyed the automobile marketplace and observed that
> GPS systems for automobiles *were dedicated systems* that were
> required to be installed in parallel to existing electronics in a car.

(Br. at 2) (emphasis added).  As described below, his statements about the "computer system"

are not permissive; rather they are definitive as to the scope of the "invention" of the Hindman

Patents.  As a result, the intrinsic record overwhelmingly supports Defendants' construction.[1]

### A.    Mr. Hindman Defined "Computer System" as Flexible and General Purpose

Mr. Hindman first defined the computer of his invention as flexible and general

purpose in U.S. Provisional App. No. 60/038,078 (the "Provisional", Ex. A).[2]  Although now

treated dismissively by Keystone, Mr. Hindman relied upon the Provisional during prosecution

to establish priority for his claimed inventions.  (*See, e.g.,* Ex. B at SIR133861, Ex. C at

SIR133894).  Indeed, he told the USPTO that it "outline[s] my invention" and constitutes its

"enabling disclosure."  (Ex. A at XMK_1735185).  More specifically, Mr. Hindman described

"the heart of this design is the employment of a personal computer based architecture."  (*Id.* at

XMK_1735195).  He further explained that the personal computer based architecture "will be

capable of running Microsoft Windows 3.1 and any desired software program that can be stored

on CD-ROM" as well as have peripheral devices such as GPS navigation units connected to the

computer.  (*Id.* at XMK_1735186).  In sum, the Provisional makes at least sixteen references to

---

[1] Defendants submit that the related terms "processor," "processing means" and "I/O processing means" ('123 Disputed Term 2; '592 Disputed Terms 2 & 3) – each of which is defined in the claims as part of the computer system – should be construed consistently with the construction of "computer system."  Accordingly, Defendants' discussion of the term "computer system" applies equally to these related terms.

[2] Exhibits A through JJ are appended to the accompanying Declaration of Marcus A. Colucci and are referenced throughout this brief as "Ex. __".

(1) the computer as flexible and general purpose and/or (2) distinguishing between Mr. Hindman's invention and prior art computers using dedicated single purpose computers.  Exhibit M contains a collection of these references from the Provisional.

In the specification of his formal utility application, Mr. Hindman continued to define his invention as based on a flexible, general purpose computer.  The specification explains that "[t]he **present invention** provides for the additional use of a microprocessor to ***augment the capabilities*** available to the mobile user."  (Ex. L, '123 at 2:10-12) (emphasis added).[3]  To achieve this end, the computer system works "in cooperation with" a variety of line replacement units ("LRU") (as recited in the claims, *e.g.*, Ex. K, '592 Claim 1 at 12:42), which is only possible if the computer system can run the different application programs required to operate the various LRUs it can be connected to:

> The ***present invention*** provides for a unique mobile computer architecture ***facilitating*** the use of LRUs. . . . Additionally, current mobile computer systems do not provide line replaceable units for purposes such as navigation and telecommunications.

Ex. L, '123 at 1:40-42, 60-63 (emphasis added); Abstract, 3:19-40, Ex. K,'592 at Claim 1.[4]

The specification also expressly contrasts the claimed flexible, general purpose computer capable of running a variety of applications necessary to work with a variety of modular LRUs, with the inflexible, dedicated prior art computer systems used in automobiles:

---

[3] Statements in the specification that characterize "the invention" (*i.e.*, as opposed to a mere preferred embodiment) are evidence of an absolute requirement because "the public is entitled to take the patentee at his word."  *Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006).  Likewise, here, the computer system has been characterized in the specification in accord with Defendants' construction.  Accordingly, Keystone's attempt to recharacterize this language as mere embodiments fails.  (Br. at 6-7).

[4] The specifications of the Hindman Patents are essentially identical.  For brevity, Defendants only cite herein to the '123 patent.  All cited passages appear in both patents.

> Current mobile computer architectures have ***fixed*** configurations which ***limit their capabilities***.  These computer systems are designed to interface with predetermined input/out devices and offer ***little flexibility*** for easy field installation and removal. . . . Examples of these ***limited mobile platforms*** are units which provide only navigation aid, or only navigation and guidance aid, or only mobile communications.  ***The present invention provides these features as well as additional ones not found in any current apparatus.***  An example is that ***no current unit provides for the additional use of a microprocessor to augment the application capabilities available to the mobile user.***

Ex. L, '123 Patent at 1:25-30, 1:67-2:7 (emphasis added).  Indeed, the specification describes the various "application capabilities" of his claimed computer system (*Id.* at 2:7-2:10):

> These capabilities include, but are not limited to, data acquisition, data analysis, non-navigation data storage and retrieval, and basic data base access.

These definitive (rather than permissive) statements lead to Defendants' proposed construction.

**B.    Mr. Hindman Distinguished His Invention Over the Prior Art as a Flexible, General Purpose "Computer System"**

The emphasis on a flexible personal computer in the Provisional and specification was followed by *repeated distinctions* of the claimed "computer system" over the prior art during prosecution.  In order to obtain his patents, Mr. Hindman argued that the claimed computer system was "general," "infinitely flexible," and one that "may accomplish multiple different independent computational tasks" and was capable of running "any number of different mobile applications."  In allowing the asserted claims, the USPTO relied upon these descriptions by Mr. Hindman.  In addition to the examples from the prosecution history discussed below, Defendants prepared Exhibit N, a collection of excerpts identifying at least twelve instances in the file history where Mr. Hindman attempted to overcome rejections of his claims by emphasizing the computer system limitation.  As shown below, these arguments (1) constitute a disavowal of claim scope over inflexible, single purpose computers and (2) further confirm the invention-defining statements in the Provisional and specification discussed above.

5

The USPTO rejected the '592 patent over two prior art references – U.S. Patent No. 4,758,959, issued to "Thoone" (Ex. AA) and U.S. Patent No. 5,787,259, issued to "Haroun" (Ex. BB).  Thoone is directed to a vehicle navigation system computer that performs position-locating and route-determining features by combining GPS satellite navigation and dead reckoning navigation systems.  (Ex. AA at 1:12-32).  The Thoone computer is relatively complex and robust and includes a microprocessor, satellite receiver, mass storage device, RAM, control unit, keyboard, and image generating module.  (*Id.* at Fig. 2).

Faced with a rejection over Thoone, Mr. Hindman argued that the Thoone computer is a "very specific computer configuration" with "no flexibility or adaptability" and therefore distinguishable from the computer system of his claimed "invention":

> [Thoone provides] a ***navigation only*** system . . . [and teaches] a **specific form** of navigation and is **distinct from a general computer platform**.  Further, Thoone covers a **very specific computer configuration** for connecting and receiving data from the specific external sensors in order to provide navigation applications and route guidance, ***therefore providing no flexibility or adaptability***. . . .
>
> Thoone's invention is not a comparable system to **applicant's invention since its configuration is inflexible and predetermined** . . . Figures 4 and 5 of **applicant's invention** disclose a **general mobile computer platform** with a **flexible** input/output management system. . . . None of these specific features and functions are taught by Thoone.

Ex. B at SIR0133860 (underlining in original, other emphasis added).

Later in the same response, Mr. Hindman reiterated his argument, characterizing the "**present invention**" as a computer system that is (1) "**infinitely flexible**," (2) capable of "sustaining any number of **different applications**" with its LRUs, (3) capable of "accomplish[ing] multiple **different** independent computational tasks," and (4) one that "can be used for **any application**":

Each of these patents referenced by the Examiner teaches away from *Applicant's invention* and away from an *infinitely flexible architecture* and optimized input/output management system based on the line replacement units, for a *mobile stand alone computer system*. None of these disclosures teach, suggest, or imply an architecture based on a *flexible*, optimized input/output management system *capable of sustaining any number of line replacement units for any number of different applications*.  . . . Further, *the present invention* applies to a *mobile computer system* and architecture which can be *used for any application* . . .

\* \* \*

Applicant's *invention* covers a mobile computer architecture that manages the input/output of multiple configurations which *may accomplish multiple different independent computational tasks. Further, Applicant's invention is a general stand alone computer system* which does not require connection of external sensors. Applicant's architecture for computation and input/output management for line replacement units is novel and non-obvious and can not be found in the prior art.

Ex. B at SIR0133863-64 (emphasis added).  In order for a computer system to meet the

requirements established by Mr. Hindman, it must be able to run a variety of application

programs, as recognized by Defendants' construction.

Subsequently, when faced with renewed rejections over Thoone, Mr. Hindman

again distinguished the Thoone computer system as not flexible enough to "sustain any number"

of LRUs, *i.e.*, not able to operate "any number of different mobile applications" used by the

various LRUs connected to the computer system:

Applicant's architecture for computation and input/output management for line replacement units is novel and non-obvious.  None of the cited patent disclosures teach, suggest, or imply a mobile input/output management system capable of *sustaining* any number of line replacement units for *any number of different mobile applications*.

Ex. C at SIR0133892 (emphasis added); *see also id.* at SIR0133894.

Mr. Hindman reiterated his flexible, general purpose computer argument to

overcome rejections over Haroun.  Haroun teaches a computer designed to interface with and

control various consumer electronic devices and to process the associated data streams.  (Ex. BB

at 1:15-3:44).  Mr. Hindman distinguished Haroun by arguing that the reference only taught an

inflexible, single-purpose computer, designed to accept a specific input format.  (Ex. C at

SIR0133894-95).  On that basis, Mr. Hindman argued that the Haroun computer was not the

general purpose computer required by his claims:

> More importantly, Haroun's invention is a **_specific network
> configuration_** for a **_fixed_** home entertainment system and is not a
> mobile **_general purpose computation_** and input/output management
> platform disclosed by the Applicant. . . . Haroun discloses that a
> fundamental aspect of the invention is that it is **_restricted to a specific
> configuration_** for the transmission of audio signals . . .

*Id.* (emphasis added).  Notably, the computer taught in Haroun (capable of processing a variety

of audio signals from a variety of sources) appears to be far more flexible than Defendants'

receivers (whose computing chipsets are generally limited to processing a single format of

satellite signal).  (*See, e.g.*, Ex. BB at 3:66-5:55).

Keystone cannot, on the one hand, rely on arguments that prior art computers

were inflexible to overcome rejections over Thoone and Haroun and then, on the other hand,

seek a construction broad enough to cover exactly these types of less flexible computing devices.

"Claims may not be construed one way in order to obtain their allowance and in a contrary way

against infringers."  *Tandon Corp. v. U.S. Int'l Trade Comm'n*, 831 F.2d 1017, 1021 (Fed. Cir.

1987).  It is well settled that "[t]he prosecution history limits the interpretation of claim terms so

as to exclude any interpretation that was disclaimed during prosecution."  *Rheox, Inc. v. Entact,

Inc.*, 276 F.3d 1319, 1325 (Fed. Cir. 2002).  Mr. Hindman's repeated and unequivocal arguments

that the prior art does not teach his claimed general purpose computer capable of running a

variety of applications constitute such a disclaimer and confirm Defendants' constructions.[5]

---

[5] Even without considering disavowal, Mr. Hindman's arguments confirm the definition in the
Provisional and specification of "computer system" as flexible and general purpose.  *See 800
Adept, Inc. v. Murex Secs., Ltd.*, 539 F.3d 1354, 1365 (Fed. Cir. 2008) (applicant's statements
during prosecution confirmed construction based on claims and specification).

Particularly relevant here is the Federal Circuit's recent affirmance of a construction of the claim term "portable microprocessor system" as excluding portable computers that include a built-in display or keyboard. *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366 (Fed. Cir. 2008). In that case, the applicant overcame rejections by contrasting the claimed portable computer with prior art laptops by arguing that the prior art laptops disadvantageously sacrificed portability by including keyboards and displays. *Id.* at 1375-76. The Federal Circuit agreed that these distinguishing arguments constituted disavowal of claim scope and, therefore the claim term could not encompass keyboards and displays (which otherwise could have been covered by a "portable microprocessor system.") *Id.* at 1378-79.

Similarly, this Court has narrowly construed claims consistent with the specification and arguments made by applicants during prosecution. *See Versata Software, Inc. v. Sun Microsystems, Inc.*, Civil Action No. 2-06-CV-358, 2008 WL 3914098, at *5 (E.D. Tex. Aug. 19, 2008) (Ward, J.). In *Versata*, the plaintiff argued (the same as Keystone here) against defendant's construction of the term "structural model hierarchy" because it purportedly "would exclude a preferred embodiment" and "would render some of the claim language superfluous." *Id.* at *4. This Court approved defendant's construction based on passages in the specification describing "the present invention" and guidance from the prosecution history. *Id.* As in *Dell* and *Versata*, the specification and Mr. Hindman's arguments in the prosecution history that the prior art did not provide the flexible, general purpose computer of his claims constitutes a disavowal of inflexible, dedicated purpose devices.

The Federal Circuit's opinion in *Hutchins v. Zoll* is also instructive with regard to the distinction between general purpose and narrow purpose computers. In *Hutchins*, the Federal Circuit affirmed a district court's finding that claims requiring a "general purpose computer

system" did not cover a RISC [reduced instruction set computer] microprocessor with limited functionality flexibility. *Hutchins v. Zoll Med. Corp.*, 492 F.3d 1377, 1381 (Fed. Cir. 2007). The "general purpose computer" limitation had been added to the claims during prosecution to distinguish the invention from similar prior art devices with *dedicated* purpose microprocessor units. *Id.* Likewise, here, Mr. Hindman argued to the USPTO that the asserted claims could not be anticipated by the Thoone and Haroun devices because their computers were dedicated purpose devices, not the claimed flexible and general purpose computer.

### C.    Keystone Cannot Explain Away the Overwhelming Intrinsic Record

To try and overcome this overwhelming intrinsic record defining the computer as flexible and general purpose, Keystone attempts to assign the "flexibility" characteristic to the I/O management system rather than the computer system itself.  (Br. at 6-7).  Keystone's argument fails for at least three separate reasons.

First, as the claim language itself makes clear, the central component of the I/O management system is the computer system.  Claim 1 of the '592 patent recites "[a]n apparatus for computation and input/output management in a mobile environment comprising a computer system," and recites that the "computer system" includes the "I/O processing means"  (Ex. K at 12:32-36).  Similarly, '123 patent claim 1 recites "[a]n apparatus for input/output management in a mobile computing environment comprising a computer system." (Ex. L at 12:42-4).  Therefore, flexibility of the I/O management system necessarily entails flexibility in the computer system.

Second, Keystone concedes, as it must, that the claimed computer system must be flexible enough to work with a multitude of LRUs.  (Br. at 6).  This requires that the computer system operate a variety of application programs as used by the LRUs.  In fact, Mr. Hindman admitted that the computer system's ability "to deal with multiple different" LRUs led the

USPTO to allow his claims. (Ex. FF at 178:8-179:8). Keystone's construction for "computer system" ignores this flexibility requirement that allowed the claims to issue over prior art.

 Third, Keystone acknowledges, and the specification states, that the LRUs/units are capable of running a variety of applications. (*See, e.g.,* Ex. FF at 132:6-133:3; Ex. L, '123 at 1:61-2:12). As a result, Keystone's argument that the computer system need not be capable of running different applications would require that the LRUs run these applications independently of the computer system. However, the claims flatly contradict this premise, expressly reciting that the LRUs/units carry out their functions by working "in *cooperation* with" the computer system. Ex. K, '592 Claim 1 ("each of the line replacement units performs a dedicated function in the mobile environment *in cooperation with* the processing means of the *computer system*"); Ex. L, '123 Claim 1 ("a unit configured to receive a wireless signal and perform a function in the mobile environment *in cooperation with the computer system*") (emphasis added).

 The specification further confirms the computer system's role of running the LRUs ("facilitating the use of LRUs"), as do Mr. Hindman's arguments in obtaining allowance of the claims over prior art ("capable of sustaining any number" of LRUs). (Ex. L, '123 at 1:40-42; Ex. B at SIR0133864, Ex. C at SIR0133892). Because (1) the LRUs are capable of running a variety of applications and (2) the claims require the computer to play a role in working with the LRUs and units, the computer system must be able to run a variety of application programs.

 Keystone next argues that, although the specification does indeed describe a computer system *capable* of running a variety of operating systems and/or applications, the description concerns *mere embodiments* and should not be construed as limitations. (Br. at 7). To the contrary, as described above, the specification characterized this flexibility as "the invention," and not a mere embodiment. Mr. Hindman also narrowed the scope of his invention

to overcome prior art by arguing that the prior art computers did not have the capability of running a variety of applications (an argument directed to *claims*, not embodiments).

        Keystone's request for an "ordinary meaning" construction covering any computer system improperly encompasses disclaimed prior art and ignores the claims, specification and file history.  Keystone should be held to its arguments and concessions to the USPTO used to obtain the claims now asserted against Defendants.  *Seachange Int'l Inc. v. C-COR Inc.*, 413 F.3d 1361, 1372 (Fed. Cir. 2005).[6]

**II.**    **"Persistent Unique Hardware Identification Used to Restrict Access to Data Received at the Unit Via the Wireless Signal" ('123 Disputed Term 5)**

| Claim Term In Context | Defendants' Proposed Construction |
|---|---|
| a unit configured to receive a wireless signal and perform a function in the mobile environment in cooperation with the computer system, the unit having a ***persistent unique hardware identification used to restrict access to data received at the unit via the wireless signal***; | A non-volatile number or bit pattern that is unique to a particular unit is provided to the computer system so that the computer system makes a determination whether it will accept data from the unit that was received from a wireless signal. |

        The parties' dispute concerning the construction of this term stems from four fundamental disagreements: (1) whether the computer system plays *some* role in verifying the persistent unique hardware identification; (2) whether the persistent unique hardware identification can *ever* change; (3) whether the restricted data must be "user requested;" and (4) whether the hardware identification is unique within a given context or unique as to the world.[7]

---

[6] Keystone disparages Defendants' construction of the computer system as a "personal computer." (Br. at 5-6).  Defendants believe that "personal computer" would be easily understood by the jury as a general purpose, flexible computer.  However, whether or not the term "personal" modifies "computer" does not affect the substance of Defendants' construction.

[7] Contrary to Keystone's suggestion (Br. at 12-13), Defendants do not dispute that codes and serial numbers may also serve as persistent unique hardware identifications.  The broader "number or bit pattern" language proposed by Defendants encompasses such identifiers.

A. **The Computer System Verifies the Persistent Unique Hardware Identification**

A central aspect of the claimed invention is security verification between two hardware components – the unit and the computer.  The specification and arguments to the USPTO describe the security feature as one where the persistent unique hardware identification must be provided by the unit to, and evaluated by, the computer to determine if the computer will accept data from the unit.  Keystone's proposed construction removes the computer from the verification process by focusing on an out-of-context excerpt from the claims and ignoring the intrinsic record.

Claim 1 of the '123 patent recites that the "unit communicates the persistent unique hardware identification ***to the computer system***" and describes the respective roles of the computer and unit to verify the persistent unique hardware identifier (emphasis added):

> [A] unit configured to receive a wireless signal and perform a function in the mobile environment ***in cooperation with the computer system, the unit having a persistent unique hardware identification used to restrict access to data received at the unit via the wireless signal***;

Keystone has stipulated that the persistent unique hardware identification passed from the unit to the computer is the same unique hardware identification that is used to restrict access to data. Defendants' construction, unlike Keystone's, recognizes the logical relationship between the passage of the identification from the unit to the computer and the resulting restriction of data if the unique hardware identification is not correct.  Indeed, if the computer played no role in evaluating the unique hardware identification, it would make no sense for the independent claim to describe (as it does) the "cooperation" of the computer system and the unit, as well as the requirement for the unit to "communicate" the identification to the computer system.

Defendants' proposed construction is further grounded in the specification.  The Hindman Patents describe a theft deterrent verification process between a modular replaceable unit and a computer system in which the unit identifies itself to the computer and then the *computer* determines if the identifier is authorized (Ex. L, '123 at 7:29-33) (emphasis added):

> If the proper address signature **is not provided to the mobile computer system** in the main assembly 3, data access can be restricted. This can be done via user selected passwords or by hardware unit code and pin configuration.

Defendants' construction is further supported by Mr. Hindman's definitive argument during prosecution that the purpose of communicating the identification from the unit to the computer is so that the *computer* can determine if the unit is authorized:

> Applicant respectfully submits that neither Haroun nor Thoone teach or suggest the use of a unique hardware identification to specifically ***identify a unit to a computer system***.

Ex. F at SIR0133317 (emphasis added).

The specification and prosecution history also explain, as Keystone concedes (Br. at 14-15), that the purpose of this verification process is to provide for theft deterrence and security for the "entire system" – *i.e.*, the unit and computer.  As the specification explains:

> This feature promotes safety and data security for the system as well as providing substantial theft deterrence since the ***entire system*** can only be accessed by authorized users. This I/O management network also allows for quick field replacement of secured and authorized LRUs.

(Ex. L, '123 at 7:33-38) (emphasis added).  In fact, during prosecution, Mr. Hindman cited to this portion of the specification to explain how the persistent identification is used to provide "substantial theft deterrence" by being communicated *from the unit to the computer system for verification purposes*:

> The Specification of the '182 Application clearly supports the use of a unique hardware identification to restrict data access and unit

14

> functions . . . the specification describes that a unique address signature for a unit can be used to restrict access to data and unit functions thereby providing "substantial theft deterrence." . . . *each hand held interface unit has a unique address from which to communicate with the mobile computer architecture. If the proper address signature is not provided to the mobile computer system in the main assembly, data access can be restricted. . . .*" Thus, the unique address signature, which can be a hardware unit code (i.e., a persistent identification for the unit) is used to restrict data access . . . *Applicant submits that these features of the present invention are not taught by the cited art.*

Ex. I at SIR0133420 (emphasis added).[8]

Keystone's proposed construction seeks to read out any requirement that the computer plays a role in the verification process, arguing that Defendants' construction is merely an embodiment and not a limitation. (Br. at 17). Keystone's conclusory assertion cannot make it so. To the contrary, as shown above, the intrinsic record establishes the computer's role in verifying the hardware identification as the heart of the claimed invention.[9] As Keystone itself argued, but now ignores, claims must be construed consistently with the purposes of the invention and the problems it addresses. (Br. at 3).

**B.    Persistent Means Non-Volatile, Not Permanent**

The dispute on this portion of the term concerns whether the "persistent unique hardware identification" must be non-volatile, *i.e.*, it should generally persist, even if the machine is turned off, until it is intentionally changed (as Defendants contend) or must be permanent and can *never* change (as Keystone argues). Keystone's overly narrow construction is

---

[8] Although beyond the scope of this brief, Defendants assert that a "persistent unique hardware identification" is neither disclosed nor enabled in the specification of the '123 patent and therefore that the claims incorporating this term are invalid under 35 U.S.C. § 112.

[9] Keystone suggests that a component other than the computer system may perform the verification, but cannot point to a single example in the intrinsic record to support this view. (Br. at 17). Mr. Hindman was also unable to identify an example. (Ex. FF at 225:20-234:2).

flatly contradicted by Mr. Hindman's statements in the prosecution history that the identification

is not "typically" changed, as opposed to "never" changed:

> This feature of the ***present invention*** allows the unit to identify
> itself to the computer system according to a persistent unique
> identification (i.e., ***one that does not typically change over time***).

Ex. H at SIR0133355 (emphasis added).  Keystone's out-of-context excerpt from the file history

that an identification should not change when a device is "connected to or removed from a

computer system..." (Br. at 13) merely proves that the identification is non-volatile and does not

require that the identification can *never* change.[10]   Accordingly, this argument may be rejected.

### C.    The Restricted Data is Not Limited to "User Requested Data"

Keystone next seeks to limit the scope of the '123 patent to the restriction of "user

requested data."  (Br. at 14-15).  The claims, however, simply recite "restrict[ing] access to

data," which covers data passively collected by the unit in addition to data specifically requested

by the user.  Keystone fails to identify any evidence in the intrinsic record that supports limiting

the scope of the claim term in this manner, nor does any such support exist.

### D.    A Unique Hardware Identification Need Not Be Unique to the World

The parties' disagreement here is whether the "persistent unique hardware

identification" may be "unique" within a given context (as Defendants contend) or must be

globally unique throughout the world.  A simple example will illustrate the disagreement.  Under

Defendants' construction, in a particular municipal police radio network, each police radio would

have a distinct identifier within the system in which it is used, but need not be distinct from

radios used in other municipal radio networks.  Under Keystone's construction, no two police

radios in the world could have the same identifier.

---

[10] The extrinsic evidence Keystone cites (Br. at 14) is inapposite.  It has been cherry picked from
general purpose dictionaries and ignores the conventional *technical* usage of "persistent."

Defendants acknowledge (unlike Keystone) that the intrinsic record is silent as to the meaning of "unique."  Indeed, Keystone cites no intrinsic support for this overly narrow construction.  Instead, Keystone simply references the word "unique" and relies on a *general purpose* dictionary to define "unique."  (Br. at 13).  However, "unique" in the *computer* world has a more precise meaning — one of a kind within a given context.  Exhibit O collects the relevant computer extrinsic evidence, showing that "unique" is within a given context.[11]

E.    **Related Terms:**

(1)    **"Restrict Unit Functions to Authorized Users" ('123 Disputed Term 8)**

| Claim Term In Context | Defendants' Proposed Construction |
|---|---|
| The apparatus of claim 1, wherein the persistent unique hardware identification is used to *restrict unit functions to authorized users*. | The persistent unique hardware identification is used to prevent unauthorized users from accessing, controlling, operating or programming the unit. |

The dispute for this term relates to the meaning of "restrict unit functions." Defendants' proposal clarifies for the jury that this means restricting unauthorized users from using the various functions of the unit.  The importance of the theft deterrence feature emphasized by Keystone (*e.g.,* Br. at 2-3) guides Defendants' construction.  Importantly, Keystone agrees that the theft deterrence feature is central and uses it to argue for a narrow construction of "persistent unique hardware identification."  (*See* Br. at 14-15).  Keystone's

---

[11] Courts have construed "unique" in the computer context consistent with Defendants' proposed construction (*i.e.,* as unique within the context of a system).  *See, e.g., Tandberg Data Corp. v. H.P. Co.,* 06-cv-102-LTB, 2008 U.S. Dist. LEXIS 8094, at *9-14 (D. Colo. Jan. 22, 2008) (construing  "unique block-identifying information" to mean information that distinguishes data blocks within a specific track, but not necessarily across an entire data tape); *Uniloc USA, Inc. v. Microsoft Corp.,* 447 F. Supp. 2d. 177, 184-185 (D.R.I. 2006), *aff'd in part and remanded by,* U.S. App. LEXIS 16983 (Fed. Cir. Aug. 7, 2008) (rejecting proposed construction for "licensee unique ID" that would require "the uniqueness of the identifier [to] be 'one-of-a-kind,' somewhat akin to DNA uniqueness" and recognizing that "'unique' is a relative term").

proposal limiting the term to require only prevention of performing "one or more actions" is

inconsistent with this central theft deterrent concept and therefore should be rejected.[12]

(2)    "Recognize a Unique Address in Order to Communicate With the
       One or More Line Replacement Units" ('592 Disputed Term 8)

| Claim Term In Context | Defendants' Proposed Construction |
|---|---|
| the I/O processing means is required to *recognize a unique address in order to communicate with the one or more line replacement units*, wherein said I/O processing means uses the data bus means in conjunction with the discrete line means to address said one or more line replacement units. | The computer system's I/O processor must recognize a particular number or bit pattern of a particular line replacement unit on the data bus in order to establish communication between the computer system and the particular line replacement unit. |

The dispute for this term mirrors two of the issues for persistent unique hardware

identification discussed above: (1) whether the *computer* must recognize the unique address to

restrict access (*see* Section II.A); and (2) whether the "unique address" must be globally unique

in the world, or just unique within a system (*see* Section II.D).

As explained above (Section II.A), the intrinsic record confirms Defendants'

construction that the computer system's I/O processor must recognize the address to allow

communication with the LRU.  First, the claim affirmatively recites this relationship: "*the I/O*

*processing means* is required to recognize a unique address in order to communicate with the

one or more line replacement units." (Ex. K, '592 Claim 1) (emphasis added).  There can be no

dispute that the I/O processing means is a component of the claimed computer system (*see* Ex.

K, '592 Claim 1: "a computer system with . . . I/O processing means").  As a result, the claim

unambiguously supports the construction that the *computer system* must recognize the unique

---

[12] In support of its construction, Keystone cites to the specification as disclosing the use of the persistent unique hardware identification "to prevent access to *certain* data from the unit" (Br. at 22, emphasis added).  However, the cited portion of the specification (7:33-36) supports Defendants' construction, stating that "the *entire system* can only be accessed by authorized users."  (emphasis added).  It is not limited to preventing access to "certain data."

address.  *See* Ex. K, '592 at 7:25-28 ("If the proper address signature is not provided to the mobile computer system in the main assembly, data access can be restricted").[13]

Importantly, although excluded from its proposed claim construction, Keystone now concedes that the *computer system* must perform *some operation* on the LRU's unique address before allowing further communication:

> The claims of the '592 Patent provide that the **computer system must "recognize"** a unique address from the line replacement unit. As a result, at least some information **must be sent** over the data bus from the line replacement unit **to the computer system** . . .
> * * *
> "in order to communicate with the one or more line replacement units" should be construed in light of the fact that **some data is necessarily passed between the unit and the computer system** . . .
> * * *
> "To recognize" simply means that the [computer system's] **I/O processing means** determines some characteristic of or the individuality of a unique address.

Br. at 25-26 (emphasis added).

Second, for the reasons discussed above with respect to persistent unique hardware identification (Section II.C), there is no support for Keystone's overly narrow position that the address must be unique to the world (*i.e.*, as opposed to merely unique within a system).

## III.    "Unit" ('123 Disputed Term 3)

| Claim Term In Context | Defendants' Proposed Construction |
|---|---|
| a **unit** configured to receive a wireless signal and perform a function in the mobile environment in cooperation with the computer system | A device, separate from those in the computer system, that is designed to be easily installed and removed from the apparatus in the mobile environment. |

---

[13] Keystone's attack on Defendants' construction as being inoperable because the computer cannot "enable" communication without first receiving the unique address (Br. at 24-25) is a red herring.  Defendants' agree with Keystone's position (Br. at 25) that the LRU sends its unique address to the computer system.  The dispositive issue, however, is whether the *computer system* then determines if it will allow *further* communications.

The dispute here centers on whether the "unit" should be limited to devices designed "to be easily installed and removed" in the mobile environment.  The intrinsic record overwhelmingly confirms that it must.  The parties agree that the LRUs claimed in the '592 patent must be modular and easily replaceable in the field.  (*See* Br. at 23).  Keystone attempts to read this limitation out of the claims of the '123 patent by ignoring the clear and unambiguous specification and arguments advanced in the prosecution history.

A.      **The Specification Teaches That a "Unit" is Modular and Easily Replaceable**

The specification of the Hindman Patents repeatedly explains that the primary feature of the claimed invention is a flexible computer and I/O management system directed to accommodate a variety of modular, easily replaceable components.  For example, the originally filed '123 Abstract confirms that the "invention" (not mere embodiments) is directed to modular, easily replaceable "units" and an architecture that can accommodate swapping them in and out:

> The ***present invention*** further provides a bus network which allows for an efficient and durable Input/Output (I/O) management system. ***The I/O management system has configurable connections to allow for modular addition, expansion, or replacement of navigation, crash detection, and communication line replacement units (LRUs)***. Additional I/O device connections allow several modes of input into the computational system.

Ex. HH at SIR133218 (emphasis added).  Similarly, the '123 "Summary of the Invention" states that the "invention" provides modular, easily replaceable components connected to a computer:

> The ***present invention*** further provides a specifically designed and optimized ***I/O management system for line replacement units (LRUs). This I/O management system allows for modular expansion and system upgrades***.

Ex. L, '123 at 3:28-31 (emphasis added).

Consistent with these definitions of "the invention," the '123 specification contains multiple additional references to the "unit" as a modular, easily replaceable device.

20

Importantly, Keystone identified several passages in its brief (Br. at 9) as well as many others in

its 4-3 Statement (Ex. GG at C) as relevant to the construction of "unit."  All of these passages

support Defendants' construction.  They are collected in Exhibit S and organized by those

passages that (1) discuss a "line replacement unit," (which Keystone concedes is modular and

easily replaceable); (2) discuss a modular, replaceable unit; or (3) are irrelevant to this issue.  For

example, Keystone identified a lengthy discussion in the specification of how "hand held units"

are addressed with an "I/O management network [that] allows for quick field replacement of

secured and authorized LRUs."  (Ex. L, '123 at 7:33-43).

   In response, Keystone mischaracterizes the specification, claiming that it

"repeatedly" refers to a "unit" as a "collection of components."  (Br. at 9).  The portion of the

specification cited by Keystone (Ex. L, '123 6:38-7:44, 8:19-9:54, and Fig. 7) ***does not contain***

the quoted phrase "collection of components," nor does the phrase appear anywhere else in the

Hindman Patents.  Remarkably, Keystone relies on Figure 7 (Br. at 9), even though it supports

Defendants' position by showing a coherent device — not a mere collection of components.[14]

Keystone cannot point to a *single* instance in the specification that actually supports its

construction of "unit" as anything other than a modular, easily replaceable device.  Accordingly,

these invention-defining statements limit the scope of the claims.  *SciMed Life Sys., Inc. v. Adv.*

*Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1344 (Fed. Cir. 2001).

  **B.**  **The File History Confirms That a "Unit" is Modular and Field-Replaceable**

   Mr. Hindman's repeated arguments to overcome prior art during prosecution of

the '123 patent confirm that the claimed unit is modular and easily replaceable.  These arguments

are definitional statements used to distinguish the claims from prior art, not mere permissive

---

[14] At best, Fig. 7 supports the unremarkable proposition that a unit (like any other device) is
comprised of components.  It does not mean that *any* set of components constitutes a unit.

examples.  For example, Mr. Hindman argued that his claimed invention uses a persistent unique

hardware identification to identify units, thereby enabling the units to be swapped in and out:

> ***Claim 60 further recites*** that the **unit** has a persistent unique
> hardware identification and communicates the persistent unique
> hardware identification ***to the computer system***.  This feature of
> the present invention allows ***the unit*** to identify itself to the
> computer system according to a persistent unique identification . . .
> ***The identification remains persistent so that the unit can
> communicate the same unique identification if the unit is
> disconnected from a first computer system and is connected to a
> second computer system.***

Ex. H at SIR0133355 (emphasis added).  In a subsequent response, Mr. Hindman again argued

the importance of a unique identifier as a unit theft deterrent feature.  (Ex. I at SIR0133420).

These arguments only make sense if the "unit" could easily be removed in the field.  A theft

deterrent system that prevented the unit from being used with a second computer would be

pointless if the unit could not be removed from the first computer.

Keystone cannot escape construction of this term that is consistent with the

fundamental theft deterrence feature of the claimed invention and the clear statements in the

specification and prosecution history of the flexible, swap-enabling I/O architecture of the

claimed invention.  *Praxair, Inc. v. ATMI, Inc.*, __ F.3d __, Nos. 2007-1483, 2007-1509, 2008

WL 4378391, at *15 (Fed. Cir. Sep. 29, 2008) ("The claims of the patent must be read in light of

the specification's consistent emphasis on this fundamental feature of the invention."); *Flex-*

*Rest., LLC v. Steelcase, Inc.*, 455 F.3d 1351, 1361 (Fed. Cir. 2006) (cited by Keystone for this

proposition); Keystone's Br. at 14-15 (relying on importance of theft deterrence to seek narrow

claim construction).

Keystone makes two arguments to support its construction, each of which fails.

First, Keystone argues that claim differentiation requires different constructions for the terms

"unit" and "line replacement unit."  (Br. at 10).  The critical flaw in this analysis is that "claim

differentiation is not a 'hard and fast rule of construction,' and cannot be relied upon to 'broaden claims beyond their correct scope'" *Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001) (citation omitted).  That is exactly what Keystone seeks to do by citing claim differentiation and ignoring the oft-repeated fundamental features of the "unit" in the intrinsic record.[15]  As shown above, the specification and file history *only* support a unit that is modular and easily replaceable, defining this as part of the "invention," not a mere embodiment.  Keystone's second argument, that Defendants seek to use an embodiment to import a limitation into a claim (Br. at 10-11), fails for this same reason.

### C.   Related Term:

### (1)   "Line Replacement Unit" ('592 Disputed Term 4)

| Claim Term In Context | Defendants' Proposed Construction |
|---|---|
| one or more *line replacement units*, wherein each of the *line replacement units* performs a dedicated function in the mobile environment in cooperation with the processing means of the computer system; | A device, separate from those in the computer system, that is designed to be easily installed and removed from the apparatus in the mobile environment. |

While the parties agree that "line replacement units" must be easily replaceable, they disagree on whether the term covers a "device" (as Defendants contend) or may also cover an arbitrary "collection of components" (as Keystone contends).  The specification describes the LRU as a functional and complete device.  (*See, e.g.,* Ex. L, '123 at 3:30-38, 6:38-67; Ex. HH, Abstract (as filed)).  Moreover, as discussed in Section III.A, the portions of the specification cited by Keystone contradict its arbitrary "collection of components" construction.

---

[15] *See also Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1370 (Fed. Cir. 2007) ("the written description and prosecution history overcome any presumption arising from the doctrine of claim differentiation"); *Versata*, 2008 WL 3914098, at *4 (Ward, J.) ("the specification and prosecution history control this dispute notwithstanding the doctrine of claim differentiation").

Keystone's construction should also be rejected because it is inconsistent with the well understood meaning of the term.  "Line replacement unit" is a term of art, first used in the military context, for a "black box" module that may be easily installed, replaced and removed in the field (*i.e.*, in specific contrast to components that must be replaced in a workshop or laboratory setting).  Exhibit R summarizes the extrinsic evidence confirming that LRUs are discrete modules that are easily swapped in and out, not arbitrary collections of components. Therefore, the Court should reject Keystone's "collection of components" construction.

**IV.  The Claims Expressly Recite That the "Discrete Line Means" Provides Addressing Information ('592 Disputed Term 9)**

| Claim Term In Context | Defendants' Proposed Construction |
|---|---|
| the I/O processing means is required to recognize a unique address in order to communicate with the one or more line replacement units, wherein said *I/O processing means uses the data bus means in conjunction with the discrete line means to address said one or more line replacement units*. | The computer system's I/O processor uses data from both the data bus and the discrete line(s) to form the address (i.e., the number or bit pattern that is particular to a particular line replacement unit on the data bus) that it uses to communicate with and exchange data with the line replacement units. |

The disagreement here focuses on whether the discrete line means plays a role in *addressing* or, merely *communicating with* the line replacement units.  Defendants respectfully submit that the claims and intrinsic record require *addressing*.

First, the plain language of the claim recites that the discrete line means assists the I/O processing means in addressing the LRUs.  '592 Claim 1 recites that the discrete line means is used "in conjunction" with the I/O processing means  "to address said one or more line replacement units."  This language unambiguously confirms the role of the discrete line means in the addressing process, *i.e.*, that it helps form the address necessary to "address" an LRU.

Keystone would have the Court construe "to address" as synonymous with "to communicate."  (Br. at 28).  Such a construction may be summarily rejected because the claim limitation uses the two terms in different ways:

24

> the I/O processing means is required to recognize a unique address
> in order *to communicate* with the one or more line replacement
> units, wherein said I/O processing means uses the data bus means
> in conjunction with the discrete line means *to address* said one or
> more line replacement units.

Ex. K, '592 at Claim 1 (emphasis added).  If "to address" meant only that the discrete line means

would generally provide data to the LRUs (as Keystone suggests), the claim would have said

"communicate," as it did earlier in the claim limitation.  Instead, the claim uses different words —

"to address."  Accordingly, the claim recites using the data bus in conjunction with the discrete

line "to address," not simply "to communicate," with the LRU.[16]

Second, the specification explains the meaning of the claim language by

describing the discrete line as *providing address information* (as Defendants contend), not as

merely serving as a communication path (as Keystone suggests).  The below passage (Ex. K,

'592 at 7:18-28), cited by Keystone as relevant to the "unique address" (Br. at 25), provides an

illustrative example of the claimed process.  The addresses of units 2 and 50 are the *combination*

of a HEX address (0010 and 0101) and the address signals on two discrete lines.  This confirms

that the discrete line contributes to forming the LRU's "address" (emphasis added):

> Again referring to FIG. 5, an example is shown to demonstrate the
> uniqueness of this LRU I/O management system.  Appearing to the
> right of the depictions of hand held units 2 and 50, *there appears a*
> *combination of addresses, represented as a HEX word and two*
> *discrete lines*.  In order to promote accurate data dissemination and
> collection, each hand held interface unit has a unique address from
> which to communicate with the mobile computer architecture.  If
> the proper address signature is not provided to the mobile computer
> system in the main assembly 3, data access can be restricted.

---

[16] As a matter of law, different terms within the same claim are presumed to have different
meanings.  *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1381-82 (Fed. Cir.
2008) (construing "partially" as different from "generally" and "at least," when terms used in
same claim); *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1333 n. 3 (Fed.
Cir. 2006) ("[T]he use of two terms in a claim requires that they connote different meanings...").
Keystone fails to identify any evidence to overcome this presumption.

Third, the file history confirms that the claimed discrete line means contributes to the generation of the address for the LRU.  (*See* Ex. Q).  The USPTO Examiner allowed the claims after relying on Mr. Hindman's assertion that the prior art did not disclose using the data bus "in conjunction" with the discrete line means to generate the *address* for the LRU:

> it is agree[d] that all the prior art of record do not individually or in combination teach or suggest the I/O processing means is required to recognize a unique address in order ***to communicate*** with the one or more line replacement units, wherein ***said I/O processing means uses the data bus means in conjunction with the discrete line means to address*** said one or more line replacement units.

Ex. II at SIR0133915 (emphasis added).  The Examiner's use of both "communicate" and "address" in the same sentence confirms his understanding (the same as Defendants) that the two words have different meanings.  For these reasons, the intrinsic record overwhelmingly supports Defendants' construction.[17]

## V.   Other Disputed Claim Terms[18]

### A.   Keystone's Constructions For "Perform a Function" Are Confusing and Unnecessary

   (1)   "Perform a Function in the Mobile Environment in Cooperation With the Computer System" ('123 Disputed Term 4)

   (2)   "Wherein Each of the Line Replacement Units Performs a Dedicated Function in the Mobile Environment in Cooperation With the Processing Means of the Computer System" ('592 Disputed Term 5)

---

[17] The extrinsic evidence of record further confirms that, in the computer context, "to address" means to provide a location, as Defendants argue, not "to communicate" as Keystone argues. *See* Ex. V (*Dictionary of Computing* 9 (Oxford Univ. Press, 4th ed. 1996) ("The word address is also used as a verb: to specify a location"); Ex. W (*Microsoft Press® Computer Dictionary* 10 (1st ed. 1991) ("As a verb, to reference a storage location").  Tellingly, Keystone could not identify any extrinsic evidence supporting its novel reading of "address" in this context.

[18] Although Defendants believe their construction for '592 Disputed Term 7 is correct, Keystone's Brief has revealed that there is no meaningful distinction between the proposed constructions.  To streamline the issues for the Court, Defendants accept Keystone's proposal.

| Defendants' Proposed Construction | Keystone's Proposed Construction |
|---|---|
| Ordinary Meaning ('123 Disputed Term 4) | Converting and processing these signals to provide data to the computer system for presentation of information to the user. |
| Ordinary Meaning ('592 Disputed Term 5) | Each of the line replacement units processes data to provide particular data to the computer system for presentation of information to the user. |

The language of these terms is straightforward and should be construed according to its ordinary meaning.  Keystone's proposed constructions for these terms are confusing and unnecessary in light of their plain language.  Specifically, it is unclear what it means to "convert[] and process[]" signals or what "particular data" means.  Keystone also seeks to read in a limitation that that the data be used for "presentation of information to the user" (Br. at 11, 23).  Keystone does not (and cannot) identify any support for this limitation in the intrinsic record.

**B.     The Intrinsic Record Contradicts Keystone's Constructions For Data Bus**

**(1)     "Data Bus Means . . . For Transferring a Combination of Address, Control, and Data Information" ('592 Disputed Term 6)**

| Claim Term In Context | Defendants' Proposed Construction |
|---|---|
| data bus means coupled to the I/O processing means of the computer system and said one or more line replacement units for transferring a combination of address, control and data information; | Subject to 112(6) <br><br> Function: transferring a combination of address, control and data information between the I/O processing means of the computer system and the line replacement unit. <br><br> Construction: ordinary meaning <br><br> Corresponding structure: <br> Fig. 5, buses 51 and 53; Figs. 7 & 10a, bus 51; '592 patent at 5:22-29; 6:39-46; 6:51-57; 6:64-7:3; 7:12-14; 8:55-58; 11:10-13 |

There are two relatively minor disagreements between the parties with respect to this term.  First, Keystone seeks to construe this term to mean sending data across the data bus

means in accordance with the address and control information rather than actually *transferring* a combination of address, control and data information as Defendants contend.  Despite the more than two pages of discussion in its brief, it is unclear what Keystone's construction means or how Keystone justifies that construction  (Br. at 30-32).  The claim language clearly recites "transferring a **combination** of address, control and data information," not merely "sending data" as Keystone proposes.  Keystone cannot rewrite express limitations through hand waving.

Second, Defendants' construction clarifies for the jury that the data bus means transfers information between the I/O processing means and the LRU.  This function is expressly recited in '592 Claim 1 ("data bus means *coupled to the I/O processing means of the computer system and said one or more line replacement units* for transferring . . .") (emphasis added).  Importantly, Keystone does not dispute that this clarification is accurate.  (*See* Br. at 31-32).

**(2)    "A Data Bus Coupled to the Computer System and the Unit For Transferring Unit Data Information" ('123 Disputed Term 6)**

| Claim Term In Context | Defendants' Proposed Construction |
|---|---|
| a data bus coupled to the computer system and the unit for transferring unit data information | A common communications pathway connecting multiple devices that allows for the transfer of address, control and data information between the devices. |

Defendants' construction clarifies the meaning of a data bus as understood by a person of ordinary skill in the art — namely a device for the transfer of address, control and data information.  The specification indicates that the data bus and I/O discrete line network includes "address, control and data connections" to connect the I/O processor to an LRU.  (Ex. L, '123 6:43-45).  Indeed, this understanding is confirmed by the extrinsic evidence cited by Keystone as relevant to this term (Ex. GG at Ex. C), namely "[o]ne group of lines carries data: another carries memory addresses (location) where data items are to be found: yet another carries control signal." *Microsoft Press® Computer Dictionary*, at pp. 68, 129 (3rd Ed. 1997) (Ex. P).

### C.    "Means For User Applications" is Indefinite ('592 Disputed Term 10)

| Claim Term In Context | Defendants' Proposed Construction |
|---|---|
| The apparatus further providing **means for user applications** wherein the applications are audio, visual or multi-media | Not subject to 112(6)<br><br>Indefinite |

A claim is "indefinite if its legal scope is not clear enough that a person of ordinary skill in the art could determine whether a particular composition infringes or not." *Geneva Pharms., Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1384 (Fed. Cir. 2003). "Means for user applications" has no specific meaning, nor does the specification provide any guidance.[19]  Therefore, a reader of the '592 patent is unable to determine the meaning of this phrase. As a result, the claim limitation is indefinite.

**CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court adopt Defendants' claim constructions as set forth in the October 10, 2008 Revised Joint Claim Construction Statement.

DATED:    October 31, 2008

By:    /s/ Elizabeth L. DeRieux
S. Calvin Capshaw
State Bar No. 03783900
Elizabeth L. DeRieux
State Bar No. 05770585
**CAPSHAW DERIEUX, LLP**
The Energy Centre
1127 Judson Road, Suite 220
Longview, Texas 75601-5157 Telephone:
(903) 236-9800
Facsimile:  (903) 236-8787
Email: ccapshaw@capshawlaw.com
Email: ederieux@capshawlaw.com

---

[19] The only reference in the specification to "user applications" begs the questions as to what a "user application" is: "The Application Specific Integrated Circuit (ASIC) 28 also may be designed for useful, specific mobile user applications."  Ex. K, '592 at 5:33-35.

OF COUNSEL:
Nicholas L. Coch
Peter A. Abruzzese
Jonathan S. Caplan
Mark A. Baghdassarian
Aaron M. Frankel
Marcus A. Colucci
**KRAMER, LEVIN, NAFTALIS &**
  **FRANKEL LLP**
1177 Avenue of the Americas
New York, New York  10036
(212) 715-9100
Email: ncoch@kramerlevin.com
Email: abruzzese@kramerlevin.com
Email: jcaplan@kramerlevin.com
Email: mbaghdassarian@kramerlevin.com
Email: afrankel@kramerlevin.com
Email: mcolucci@kramerlevin.com

*Attorneys for Defendants*
*Sirius XM Radio Inc., Sirius Satellite Radio*
*Inc., XM Satellite Radio Holdings, Inc. &*
*XM Satellite Radio, Inc.*

30

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on October 31, 2008.


/s/ Elizabeth L. DeRieux
Elizabeth L. DeRieux