**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| KEYSTONE AUTONICS, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 2:07-CV-61 (TJW) |
| | § | |
| SIRIUS SATELLITE RADIO INC. ET AL., | § | |
| | § | |
| Defendants. | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

After considering the submissions and the arguments of counsel, the Court issues the following order concerning the claim construction issues:

## I.      Introduction

Plaintiff Keystone Autonics, Inc. ("Keystone") filed this case accusing Defendants Sirius Satellite Radio Inc. and XM Satellite Radio, Inc. (collectively, "defendants") of infringement of claims 1-31 of United States Patent No. 7,165,123 (the "'123 patent"), and claims 1-8, 10, and 12-15 of United States Patent No. 6,324,592 (the "'592 patent"). The '592 patent is the parent patent of the '123 patent.  The Court has previously granted Keystone's unopposed motion to dismiss all claims relating to the '592 patent. (Docket Entry No. 180).

## II.      Background of the Technology

The field of invention of the '123 patent revolves around mobile computer systems used

generally in the vehicle environments.  The problem that the invention claims to solve is that global position systems ("GPS") for automobiles are generally dedicated systems, difficult to install and integrate into a car, along with already installed and existing electronics.  Further, the inventor claims that the ability to enable or disable other services to the user post-purchase of the device are lacking in existing systems.

1.     **The '123 Patent**

The '123 patent generally relates to a system for receiving broadcast wireless signals, such as GPS or satellite radio signals, having a two-part architecture comprised of: (1) one or more units to receive a broadcast wireless signal with data for user desired functionality (such as GPS or satellite radio); and (2) a computer system that interfaces with the unit(s) to provide the desired functionality to the user.  The patent claims to provide a computer system that can receive different types of wireless signals.   One novel aspect of this computer "architecture" is claimed to be its ability to connect to a variety of modular and easily replaceable components - referred to as "units."  It discloses an I/O management and data bus architecture that allow the computer system to communicate with these modular replaceable units.  Another key feature is the security aspect of the invention, which relates to the interaction between the computer and the replaceable units.  The computer receives a unit's persistent hardware identification or unique address and then determines whether to restrict access to data or to allow further communication. This feature therefore also acts as a theft deterrent.  If a unit is stolen, the unique identifier could be used to prevent a subsequent user from accessing the wireless or satellite data received at the unit.

The abstract of the patent states:

> The present invention provides an apparatus and method for a robust and configurable mobile computer architecture with navigation computational capabilities. The present invention further provides a bus network which allows for an efficient and durable Input/Output (I/O) management system. The I/O management system has configurable connections to allow for modular addition, expansion, or replacement of navigation, crash detection, and communication line replacement units (LRUs). Additional I/O device connections allow several modes of input into the computational system. The present invention is a single, self-contained unit and provides an accessible user interface to the computer system.

'123 Patent, at Abstract.

Claim 1, an illustrative independent claim, is reproduced below:

> 1. An apparatus for input/output management in a mobile computing environment comprising:
> a computer system comprising:
> a processor;
> an input device;
> an output display;
> wherein the computer system responds to data received from the input device and outputs data to the output display;
> a unit configured to receive a wireless signal and perform a function in the mobile environment in cooperation with the computer system, the unit having a persistent unique hardware identification used to restrict access to data received at the unit via the wireless signal;
> a data bus coupled to the computer system and the unit for transferring unit data information;
> a discrete line coupled to the computer system and the unit for transferring discrete information; and
> wherein the unit communicates the persistent unique hardware identification to the computer system.

'123 Patent, Claim 1.

## III.   General Principles Governing Claim Construction

"A claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using or selling the protected invention."

*Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999).   Claim

construction is an issue of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

To ascertain the meaning of claims, the court looks to three primary sources: the claims, the specification, and the prosecution history. *Markman*, 52 F.3d at 979. Under the patent law, the specification must contain a written description of the invention that enables one of ordinary skill in the art to make and use the invention. A patent's claims must be read in view of the specification, of which they are a part. *Id*. For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims. *Id*. "One purpose for examining the specification is to determine if the patentee has limited the scope of the claims." *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000).

Nonetheless, it is the function of the claims, not the specification, to set forth the limits of the patentee's claims. Otherwise, there would be no need for claims. *SRI Int'l v. Matsushita Elec. Corp*., 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc). The patentee is free to be his own lexicographer, but any special definition given to a word must be clearly set forth in the specification. *Intellicall, Inc. v. Phonometrics*, 952 F.2d 1384, 1388 (Fed. Cir. 1992). And, although the specification may indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than the embodiments. *Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).

This court's claim construction decision must be informed by the Federal Circuit's decision in *Phillips v. AWH Corporation*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). In *Phillips*,

the court set forth several guideposts that courts should follow when construing claims. In particular, the court reiterated that "the *claims* of a patent define the invention to which the patentee is entitled the right to exclude." 415 F.3d at 1312 (emphasis added) (*quoting Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To that end, the words used in a claim are generally given their ordinary and customary meaning. *Id*. The ordinary and customary meaning of a claim term "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id*. at 1313. This principle of patent law flows naturally from the recognition that inventors are usually persons who are skilled in the field of the invention. The patent is addressed to and intended to be read by others skilled in the particular art. *Id*.

The primacy of claim terms notwithstanding, *Phillips* made clear that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id*. Although the claims themselves may provide guidance as to the meaning of particular terms, those terms are part of "a fully integrated written instrument." *Id*. at 1315 (*quoting Markman*, 52 F.3d at 978). Thus, the *Phillips* court emphasized the specification as being the primary basis for construing the claims. *Id*. at 1314-17. As the Supreme Court stated long ago, "in case of doubt or ambiguity it is proper in all cases to refer back to the descriptive portions of the specification to aid in solving the doubt or in ascertaining the true intent and meaning of the language employed in the claims." *Bates v. Coe*, 98 U.S. 31, 38 (1878). In addressing the role of the specification, the *Phillips* court quoted with approval its earlier

observations from *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998):

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

Consequently, *Phillips* emphasized the important role the specification plays in the claim construction process.

The prosecution history also continues to play an important role in claim interpretation. The prosecution history helps to demonstrate how the inventor and the PTO understood the patent. *Phillips*, 415 F.3d at 1317. Because the file history, however, "represents an ongoing negotiation between the PTO and the applicant," it may lack the clarity of the specification and thus be less useful in claim construction proceedings. *Id.* Nevertheless, the prosecution history is intrinsic evidence. That evidence is relevant to the determination of how the inventor understood the invention and whether the inventor limited the invention during prosecution by narrowing the scope of the claims.

*Phillips* rejected any claim construction approach that sacrificed the intrinsic record in favor of extrinsic evidence, such as dictionary definitions or expert testimony. The *en banc* court condemned the suggestion made by *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002), that a court should discern the ordinary meaning of the claim terms (through dictionaries or otherwise) before resorting to the specification for certain limited purposes. *Id.* at 1319-24. The approach suggested by *Texas Digital*–the assignment of a limited role to the specification–was rejected as inconsistent with decisions holding the specification to be the best

guide to the meaning of a disputed term. *Id*. at 1320-21. According to *Phillips*, reliance on

dictionary definitions at the expense of the specification had the effect of "focus[ing] the inquiry

on the abstract meaning of words rather than on the meaning of the claim terms within the

context of the patent." *Id*. at 1321. *Phillips* emphasized that the patent system is based on the

proposition that the claims cover only the invented subject matter. *Id.* What is described in the

claims flows from the statutory requirement imposed on the patentee to describe and particularly

claim what he or she has invented. *Id*. The definitions found in dictionaries, however, often

flow from the editors' objective of assembling all of the possible definitions for a word. *Id*. at

1321-22.

Phillips does not preclude all uses of dictionaries in claim construction proceedings.

Instead, the court assigned dictionaries a role subordinate to the intrinsic record. In doing so, the

court emphasized that claim construction issues are not resolved by any magic formula. The

court did not impose any particular sequence of steps for a court to follow when it considers

disputed claim language. *Id*. at 1323-25. Rather, *Phillips* held that a court must attach the

appropriate weight to the intrinsic sources offered in support of a proposed claim construction,

bearing in mind the general rule that the claims measure the scope of the patent grant.

## IV.     **Terms in Dispute – the '123 Patent**

### A.     **Agreed Constructions**

**1.     a discrete line coupled to the computer system and the unit for transferring discrete information (Claim 1)**

Both parties agree that this term means "an electrical connection between the computer system and the unit for transferring discrete information."

### 2. discrete information (Claim 1)

Both parties agree that "discrete information" means "information that in and of itself has a defined meaning."

### 3. discrete signal (Claim 2)

Both parties agree that "discrete signal" means "a signal that carries discrete information."

### 4. generating an output display based on the unit data information (Claim 2)

Both parties agree that this term means "producing characters, text, graphics or other information in a viewable format based on data from the unit."

## B. Disputed Constructions

### 1. a computer system (Claim 1)

Keystone proposes the term "computer system" be given its ordinary meaning. Keystone contends that the inventor did not in any way redefine the term "computer system" in the patent claims or the specification. If the Court deems construction of the term necessary, Keystone's proposed construction is "a device with a processor to execute instructions." Defendants' proposed construction of the term is "a flexible, general purpose personal computer capable of running a variety of operating systems and application programs." They argue that these

limitations have been defined by the inventor in the provisional application to the USPTO and in the prosecution history.

First, defendants argue that the inventor, Mr. Hindman, has defined the computer system of his invention as both flexible and general purpose. For support they point to the provisional application, wherein the inventor states in his "enabling disclosure" that the design of his invention is based on "a personal computer based architecture," and "is capable of running Microsoft Windows 3.1 and any desired software program." *See* U.S. Provisional App. No. 60/038,078. Further, defendants point to the patent specification that states that the invention augments the current capabilities available to the mobile user and facilitates the use of a variety of line replacement units ("LRUs"). *See* '123 Patent, 2:10-12. They argue that such architecture can only be achieved by a flexible computer. Further, defendants contend that the inventor repeatedly distinguished the architecture of the claimed computer system over the prior art during prosecution of the patent application, highlighting the flexible nature of the invention. Specifically, defendants point to the inventor's response to the examiner's rejection over U.S. Patent No. 4,758,959 ("Thoone"):

> Thoone's invention is not a comparable system to applicant's invention since its configuration is inflexible and predetermined. . . Figures 4 and 5 of applicant's invention disclose a general mobile computer platform with a flexible input/output management system. . . . None of these specific features and functions are taught by Thoone.

'123 File History, Response to Non-Final Office Action, at SIR0133860 (Sept. 25, 2000); *see also id*. at SIR0133863-64 ("Each of these patents referenced by the Examiner teaches away from Applicant's invention and away from an infinitely flexible architecture.").

The inventor repeated these argument in response to a second rejection by the examiner in light of the Thoone prior art, as well as the Haroun prior art. *See* '123 File History, Response to Non-Final Office Action, at SIR0133892-95 (Mar. 20, 2001). Therefore, defendants argue that the scope of this limitation should be narrowed per the inventor's own statements to the PTO. The Court agrees. *See Tandon Corp. v. U.S. Int'l Trade Comm'n*, 831 F.2d 1017, 1021 (Fed. Cir. 1987) ("Claims may not be construed one way in order to obtain their allowance and in a contrary way against infringers.").

Keystone argues that these statements do not refer to the "computer system" limitation and are not unequivocal disavowals of scope. It contends that the statements could refer instead to just the I/O management component or to the computer architecture. Therefore, it argues, any ambiguity in the prosecution history must be resolved in favor of the inventor. *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003). However, as the Federal Circuit has held, prosecution history must always receive consideration in context. *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366 (Fed. Cir. 2008) (noting that where a patentee has "expressly defined a term in the specification," that definition would control over broad remarks during prosecution). There is nothing in the specification of the '123 patent that would lead the Court to consider the distinctions argued in the prosecution history to be ambiguous. Here, the inventor distinguished his invention from the prior art several times, focusing on the flexibility of the entire invention, including the computer system. Keystone's arguments that these statements referred only to the flexibility of the computer architecture or the input/output management system are not persuasive. The Court adopts the defendants' construction as below:

"A flexible, general purpose computer capable of running a variety of operating systems and application programs."

### 2.    processor (Claim 1)

Keystone proposes the term "processor" be given its ordinary meaning.  It contends that the term "processor" is used in a manner consistent with its ordinary meaning throughout the claims and specification of the '123 Patent.  Alternatively, Keystone's proposed construction is adopted from the Communications Standard Dictionary as "a part of a computer that executes instructions." *See* COMMUNICATIONS STANDARD DICTIONARY, 722 (1983 New York: Van Nostrand Reinhold Company Inc.) (defining "processor" as "[I]n computers and communications systems, a functional unit that interprets instructions and executes them.").

Defendants argue that the term processor be construed consistently with their proposed construction of the term "computer system."   According to the defendants, a "processor" means "a device for executing general purpose personal computer instructions in the computer system." The Court finds that "processor" in the '123 patent means "a part of a general purpose computer that interprets and executes instructions."

### 3.    unit (Claim 1)

Defendants seek to construe the term "unit" as "a device, separate from the computer system, that is designed to be easily installed and removed from the apparatus in the mobile environment."   Keystone's proposed construction is: "A device or collection of components, separate from the computer system."   The parties dispute two points of construction of this term:

1) whether a "unit" can be a "collection of components" and 2) whether a "unit" is "designed to be easily installed and removed from the apparatus in the mobile environment."

On the first issue, Keystone argues the specification repeatedly refers to a "unit" as a "collection of components," and supports its proposed construction. *See* '123 Patent, 6:38-7:44, 8: 19-9:54, and Fig. 7. Further, it argues that because the "unit" has a variety of actions it can perform (e.g., receiving a wireless signal, processing the signal, communicating with the computer system, etc.), the unit must have a variety of components it uses to accomplish those actions. The Court finds that there is sufficient support in the specification to construe the term "unit" as a collection of components.

On the second issue, defendants argue that the intrinsic record overwhelmingly confirms that "unit" should be limited to devices designed "to be easily installed and removed" in the mobile environment. They note that the parties agree that the line replacement unit claimed in the parent '592 patent must be modular and easily replaceable in the field. They contend that this limitation should be read consistently for the term "unit" in the '123 patent. Defendants also contend that both the specification and the prosecution history support a construction of "unit" as a modular, easily replaceable device. Specifically, defendants point to an office action response wherein the inventor argued to the examiner that the "unit" can be "disconnected from a first computer system and . . . connected to a second computer system." *See* '123 File History, Response to Non-Final Office Action, at SIR0133355 (June 24, 2005). They further point to Mr. Hindman's arguments to the examiner about the theft deterrent feature of the "unit," which defendants argue would be pointless unless the unit could not be removed from the first computer and used in a second computer.

12

Keystone argues that the claims of the '123 Patent use the term "unit" broadly as compared to the claims '592 patent. It attempts to differentiate the term "line replacement unit" used in the '592 patent from the term "unit" in the '123 patent, arguing that by not using the words "line replacement" to modify "unit" in the claims of the '123 patent, the inventor clearly intended a different meaning. Keystone argues that equating the meanings of the two terms would render the words "line replacement" meaningless. However, "claim differentiation is not a 'hard and fast rule of construction,' and cannot be relied upon to 'broaden claims beyond their correct scope'" *Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001). The specification and prosecution history of the '123 patent make it clear to the Court that the inventor intended the "unit" to be easily replaceable, notwithstanding the doctrine of claim differentiation. *See Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1370 (Fed. Cir. 2007) ("the written description and prosecution history overcome any presumption arising from the doctrine of claim differentiation"); *Versata Software, Inc. v. Sun Microsystems, Inc.*, No. 2-06-CV-358, 2008 WL 3914098, at *5 (E.D. Tex. Aug. 19, 2008).

Based on the discussion above, the Court construes the term "unit" as "a device or collection of components, separate from the computer system, that is designed to be installed and removed from the apparatus in the mobile environment."

### 4. "perform a function in the mobile environment in cooperation with the computer system" (Claim 1)

Defendants do not propose a construction for this phrase. Defendants argue that the language of this term is straightforward and should be construed according to its ordinary meaning. They argue that plaintiff's proposed construction is confusing and unnecessary in light

of the plain meaning of the term.  Plaintiff's proposed construction of the term is "converting and processing these signals to provide data to the computer system for presentation of information to the user."   Defendants argue that it is unclear what it means to convert and process signals. Further, they contend that the limitation of data being used for "presentation of information to the user" is not supported in the intrinsic record.

Keystone argues in response that the specification shows at least two types of units that receive data and process it before passing it on to the computer system via the data bus. Specifically, it notes that such capabilities are disclosed for the navigation unit and the crash detection unit.  *See* '123 Patent, 9:22-99, 11:43-59, Figs. 7, 10a.  The computer system then presents this data to the user.  *See* '123 Patent, 8:59-62, Fig. 3.  While it is true that the units process signals received and pass them on to the computer system, there is no support that this is solely for presentation of information to the user.   Further, the ordinary meaning of term is fairly clear.  Plaintiff does not explain why a construction of this term is necessary or how there is a fundamental dispute regarding the scope of this claim term.  *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, Ltd., 521 F.3d 1351, 1362 (Fed. Cir. 2008).  The Court denies Keystone's request to construe this term.

**5.    "unit having a persistent unique hardware identification used to restrict access to data received at the unit via the wireless signal" (Claim 1)**

Keystone proposes a lengthy construction of this term: "A number, code or other location independent identifier (such as a serial number) that identifies a specific piece of hardware and does not identify any other piece of hardware of the same type, and once assigned to that specific

piece of hardware does not change, and is employed in the process of preventing retrieval of all or part of user requested data from the data that actually arrived at the unit by way of the wireless signal." Defendants' proposed construction is "a non-volatile number or bit pattern that is unique to a particular unit is provided to the computer system so that the computer system makes a determination whether it will accept data from the unit that was received from a wireless signal."

The parties dispute four issues of construction of this term (1) whether the computer system plays some role in verifying the persistent unique hardware identification; (2) whether the persistent unique hardware identification can ever change; (3) whether the restricted data must be "user requested;" and (4) whether the hardware identification is unique within a given context or unique as to the world.

On the first issue, Keystone argues that the claim language in no way requires the computer to make a verification based on the hardware identification. It points to the fact that the claims simply read "used to restrict access to data received at the unit." Therefore, Keystone argues that while the computer system may make the determination in one embodiment of the system, there is no requirement that this always be the case. It contends that the computer system alone, the unit alone, or a combination of both should be able to make this determination.

Defendants respond by arguing there is no support in the patent for anything other than the computer system doing this verification. First, they note that the claim language itself recites the "cooperation" between the unit and the computer system in receiving data and thereby determining access restriction. Further, defendants note that specification makes clear that "if the proper address signature is not provided to the mobile computer system in the main assembly

3, data access can be restricted."[1]  *See* '123 Patent, 7:29-33.    Additionally, they point to prosecution history wherein the inventor differentiated prior art by pointing to the hardware identifier that is provided to the computer system in this invention.  *See* '123 File History, at SIR0133317 (Sept. 13, 2004); *see also id.* at SIR0133420 (Oct. 13, 2005).

The Court agrees with defendants that the claim language, specification and prosecution history all demonstrate that the inventor intended the computer system to make the determination of whether access to a unit should be restricted based on the unit's identifier.  Although it may be theoretically possible, there is no support in the patent whatsoever to show that the unit itself could authenticate itself and determine that the computer should receive the wireless signal from it, or that this verification can be done by the computer and the unit in tandem.  Although it is improper to read a limitation from the specification into the claims, it is also an established axiom that claims must be read in view of the specification, of which they are a part. *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004).  As defendants point out, the only portion of the specification that discloses this aspect of the invention clearly refers only to "the proper address signature [being] provided to the mobile computer system." '123 Patent, 7:29-33.  The inventor highlighted this aspect to the Examiner, explaining that it is the computer system that verifies the hardware identification of the unit.  *See* '123 File History, at SIR0133355 (June 24, 2005) ("This feature of the present invention allows the unit to identify itself to the computer system according to a persistent unique identification.  By way of example, the

---

[1] Defendants argue that a "persistent unique hardware identification" is neither disclosed nor enabled in the specification of the '123 patent, therefore all claims including this term should be ruled invalid under 35 U.S.C. § 112.   Defendants however do not brief this issue in their claim construction response brief. *See Response*, at p. 15 n.8.

persistent unique identification <u>can be used by the computer system</u> to ensure that only registered units are operating with computer system . . . .") (emphasis added). Plaintiff's arguments that the unit itself or the unit in combination with the computer system can perform this verification are not persuasive.

On the second issue, the parties argue that the interpretation of the term, "persistent." Defendants contend that the identifier must simply be non-volatile and persist through any power loss to the unit. They also argue that this identifier can be "intentionally changed." In support, they point to prosecution history wherein the inventor defined "a persistent unique identification" as "i.e., one that does not typically change over time." *See* '123 File History, at SIR0133355 (June 24, 2005). Hence, they contend that it was not the understanding of the inventor that this identifier never changes. They propose that the hardware identification be construed by the Court as being simply non-volatile, but changeable.

Keystone responds that defendants attempt to limit the hardware identification to a type of non-volatile memory when there is no such limitation defined in the patent specification. It argues that persistent should be defined to be location-independent and unchanging once assigned. The Court agrees with the plaintiff on this point. There is no reason to read in a requirement that the persistent identifier be changeable. The Court however adopts the language used by the inventor to define "persistent" during the prosecution of the patent. *See Phizer, Inc. v. Teva Pharm., USA, Inc.*, 429 F.3d 1364, 1373 (Fed. Cir. 2005) (finding that absent contrary intrinsic evidence, "i.e." defines the meaning of a term).

The third issue is whether the data being restricted is only "user requested" data. Keystone argues that while data is continuously received at the unit, only the data requested by

the user is restricted based on the hardware identification. Plaintiff's arguments to read in such a restriction are not persuasive. The Court finds that all received data can be restricted.

The final issue on this term is if the unique hardware identification needs to be unique to the world. Defendants argue that the intrinsic record is silent as to the meaning of unique, and therefore the understanding of the term in the art should be adopted. This they contend is "one of a kind within a given context." Keystone argues that defendants improperly import this limitation based on prior art asserted by the defendants to invalidate the claims. They note that the specification refers to passwords and hardware unit codes, along with a HEX word address, as being an address signature of the unit. The Court finds that there is no reason to limit this identifier as being unique only within a given context, rather than being unique globally.

Based on the issues resolved above, the Court construes this term as: "A number, code, bit pattern or other location independent identifier that identifies a specific piece of hardware and does not identify any other piece of hardware of the same type, and once assigned to that specific piece of hardware does not typically change, and is provided to the computer system so that the computer system makes a determination whether it will accept data from the unit that was received from a wireless signal."

### 6. "a data bus coupled to the computer system and the unit for transferring unit data information" (Claim 1)

Defendants propose the following construction of the term: "A common communications pathway connecting multiple devices that allows for the transfer of address, control and data information between the devices."

Keystone's proposed construction is "one or more wires or electrical connections between the computer system and the unit for transferring data from the unit." Keystone points out that the central disagreement between the parties is whether the data bus allows for transfer of all three types of information, namely address, control and data information. Defendants argue that this is the understanding of the term "bus" in the art. Moreover, it argues the specification discloses that the data bus and I/O discrete line network includes "address, control and data connections" to connect the I/O processor to a unit. *See* '123 Patent, 6:43-45.

Keystone responds by arguing that this description simply discloses one embodiment of a data bus structure that can transfer a combination of address, control and data information. It argues the claim scope should not be limited require a combination of all three. It notes that in another part of the specification, the data bus is listed as providing only data to and from the I/O processor. *See* '123 Patent, 8:59-62. Even though similar claims in the '592 patent use the language "for transferring a combination of address, control and data information," Keystone argues that the inventor intended to include this limitation in the claims of that patent, but not here. Keystone's arguments are not persuasive as to require the Court to exclude the transmission of any address or control information on the data bus, in contrast to what the inventor has disclosed in the specification common to both the patents. The Court construes this term as: "A communications pathway connecting the computer system to one or more units that allows for the transfer of address, control and data information between the computer system and each of the units."

### 7. "restrict unit functions to authorized users" (Claim 2)

Defendants seek to construe "restrict unit functions to authorized users" as "the persistent unique hardware identification is used to prevent unauthorized users from accessing, controlling, operating, or programming the unit." Keystone argues that defendants attempt to improperly narrow the claim limitation by proposing that "restricting unit functions" requires preventing users from "accessing, controlling, operating or programming" the unit. Plaintiff argues there is no support for this limiting definition in the intrinsic evidence. Keystone's proposed construction of the term instead is "prevent the unit from performing one or more actions for unauthorized users."

Defendants argue that the inventor has emphasized the importance of the theft deterrence feature, noting that the "entire system can only be accessed by authorized users," the authorization being based on the "persistent unique hardware identification" of the unit. Therefore, defendants argue both these aspects must be included in the claim construction. However, the claim itself recites that "the persistent unique hardware identification is used to restrict unit functions." It would be redundant to include the basis of the restriction in the construction of this term as well. The Court agrees with defendants that the inventor anticipated complete restriction of unauthorized access and not partially permitted access as claimed by the plaintiff. The Court therefore construes this term to mean "prevent the unit from operating for unauthorized users."

## V. Conclusion

The court adopts the constructions set forth in this opinion for the disputed terms of the patents. The parties are ordered that they may not refer, directly or indirectly, to each other's

claim construction positions in the presence of the jury.  Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the court, in the presence of the jury.  Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the court.

SIGNED this 16th day of January, 2009.

_____
T. JOHN WARD
UNITED STATES DISTRICT JUDGE